Paul Mack BAUGH, Individually and in behalf of all other similarly situated, Plaintiff,

v.

James WOODARD, Secretary, N.C. Department of Correction; Amos Reed, former Secretary, N.C. Department of Correction; Ralph Edwards, Director of N.C. Department of Correction; Richard Kiel, Chief of Medical Service, N.C. Department of Correction; Billy Royal, M.D., Charles Smith, M.D., Sam Garrison, Warden, Richard Jeffries, Nurse, James Dupree, Nurse's Aide, Frank L. Mahan, Superintendent of Wayne County Unit; Sarah T. Morrow, Secretary, N.C. Department of Human Resource, R.J. Blackley, Acting Director of N.C. Division of Mental Health, Retardation, etc.; Bruce E. Whitaker, Chairman, N.C. Commission for Mental Health & Retardation, Defendants.

No. 81–132–CRT.

United States District Court, E.D. North Carolina, Raleigh Division.

March 26, 1985.

Gregory Malhoit, R. Giroux, Christine Heinberg and Deborah Greenblatt, Raleigh, N.C., for plaintiff.

M. Alexander Biggs, Rocky Mount, N.C., William F. O'Connell, James Peeler Smith, Raleigh, N.C., for defendants.

## MEMORANDUM OPINION

BRITT, Chief Judge.

This is a class action brought by all persons who are or will be incarcerated by the North Carolina Department of Corrections (DOC) and who have been or will be involuntarily transferred to, or subjected to inpatient treatment at, mental health facilities operated by the DOC. The plaintiff class brings this action pursuant to 42 U.S.C. § 1983 alleging that the State of North Carolina has been and will continue to violate its constitutional right to due process of law. Specifically, plaintiffs claim that the procedures followed by the DOC in transferring an inmate to a correctional mental health facility are inadequate to satisfy due process requirements. Now before the court are cross-motions for summary judgment.

The parties agree that no genuine issue of fact remains to be resolved. There are, however, two legal issues to be resolved by the court: (1) Does a North Carolina prisoner have a protectable liberty interest, arising independently under the due process clause or created by state regulations, in not being involuntarily transferred from the general prison population to a mental health care facility operated by the prison system? (2) If a North Carolina inmate does have a protectable liberty interest in not being transferred to a correctional mental health facility, do the procedures used by the Department of Corrections for involuntary transfers comport with the requirements of the due process clause?

## I—FACTS

Mental health care for North Carolina inmates is provided through the Department of Corrections and administered by the Department of Prisons (DOP), a division of the DOC. The DOC system is entirely separate from the state mental health facilities operated by the Department of Human Resources for free citizens. There are three DOC facilities which are used exclusively for the treatment of mentally ill adult male inmates: (1) Central Prison Psychiatric Hospital, an inpatient facility, which houses "acutely mentally ill" prisoners; (2) Wayne Correctional Center Mental Health Facility; and (3) McCain Correctional Center Mental Health Facility, both of which house "nonaggressive, chronically mentally ill inmates." There are separate inpatient mental health facilities for incarcerated women and juveniles. In addition, sixteen North Carolina prison facilities provide outpatient mental health care.

Paul Mack Baugh, the representative plaintiff, is a North Carolina prisoner who has been repeatedly diagnosed by prison psychiatrists as suffering from psychiatric disorders. He has been treated by prison mental health personnel on both an inpatient and outpatient basis. Plaintiff has been transferred to inpatient prison psychiatric units several times,[1] each transfer being involuntary. Plaintiff claims he was never given a formal explanation of the reasons for those transfers. He also contends that no formal hearing was ever held to allow him to challenge the transfer decisions or the decision that he needed psychiatric treatment. It is this lack of procedur-

---

1. Defendants have objected to the magistrate's characterization of the Wayne and McCain Mental Health Facilities as "inpatient" facilities. They contend that this label is inappropriate because these prison units are not hospitals but are much like other prisons except that they house only chronically mentally ill inmates and provide special mental health services for them. The court accepts defendants' distinctions be-

tween the Wayne and McCain units and the Central Prison hospital. However, it will continue to use the label "inpatient mental health facility" in reference to these three units in order to distinguish them from facilities which provide mental health services but which are not exclusively for the treatment of mentally ill inmates.

al protection that plaintiff argues violates his due process rights.

Defendants insist that the standard procedures promulgated by the DOP were always followed in transferring plaintiff (and other similarly situated inmates) to inpatient mental health facilities. According to DOP regulations, transfer of an inmate to a mental health facility begins when custodial personnel observe unusual behavior by a prisoner. DOP Health Care Procedures Manual § 403.1. The prisoner is referred to the nearest available department psychiatrist or psychologist, *id.*, who interviews the prisoner.[2] *Id.* at § 404.1. If the interviewer deems it necessary, he or she refers the inmate to the appropriate inpatient mental health care facility. *Id.* Before being sent to the facility, the prisoner is notified of the transfer and given an explanation of the reasons for the referral. Deposition of Dr. Alan Harrop, DOP Assistant Director of Mental Health Services, pp. 73–74. At the facility, mental health personnel evaluate the prisoner and make an independent decision to admit him or her for treatment and observation. Deposition of Harrop, pp. 26, 70. Only when there is a disagreement between mental health staff at the referring and receiving institutions does the DOP Directors Mental Health Review Committee become involved. DOP Health Care Procedures Manual § 404.2. Emergency referrals to Central Prison hospital may also be made by prison personnel if an inmate becomes acutely disturbed and requires immediate treatment. *Id.* at § 404.1. Defendants maintain that their procedures comport with the requirements of the due process clause.

## II—PRIOR PROCEEDINGS

Plaintiff originally brought this action in February of 1981 requesting that the defendants be enjoined from (1) forcibly administering psychotropic drugs to prisoners and (2) transferring inmates to inpatient prison mental health facilities without due process safeguards. He also requested class certification and damages.

In December of 1982 a consent judgment was filed on the issue of forcible administration of psychotropic drugs. In that document the state agreed that psychotropic medication would only be forceably administered to inmates if failure to do so would endanger the patient or others around him and if such forceable medication has been previously approved by an "involuntary medication committee." Such medication may only be prescribed for a limited period of time unless further medication is approved by the committee. It was also agreed that a patient refusing medication would be appointed a staff member as a patient representative, and would be entitled to documentation of the procedures followed.

Class certification was granted on the remaining due process issues on 1 August 1983. The parties filed cross-motions for summary judgment which were submitted to Magistrate Alexander Denson for consideration. In a memorandum and recommendation dated 19 December 1983 Magistrate Denson concluded that plaintiff had no constitutional liberty interest in not being transferred to an inpatient mental health facility within the prison system. He found, however, that plaintiff did have a state-created liberty interest in not being transferred without due process protection. After finding a protectable liberty interest the magistrate went on to recommend that the court require the State of North Carolina to provide the following procedures in transferring an inmate to an inpatient mental health facility:

1. written notice to the prisoner that referral to an inpatient mental health facility is being made, including a

---

2. Both parties object to the magistrate's finding that, under the current North Carolina procedures, at least two "psychiatric" professionals are involved in making referral decisions. In accordance with the assertions of both parties, the court finds that referrals decisions may be made by psychiatrists, psychologists or other mental health personnel. The court has conformed its summary of the facts to show that a mixture of mental health professionals are involved in these transfer decisions.

statement of the reasons for the referral;

2. an informal nonadversarial review of the reasons for the referral, including an interview with the inmate where he is given an opportunity to present his views, after a sufficient time has elapsed to allow him to prepare his presentation;

3. a neutral and independent decision maker, from within the prison mental health system, who has the authority to refuse admission;

4. a written statement by the decision maker as to the reason for his decision to admit, which decision is concurred in by two prison psychiatrists;

5. periodic review of the continuing need for treatment; and

6. effective and timely written notice of the above rights.

Both parties objected to the magistrate's memorandum and recommendation. On 23 May 1984 a hearing was held on those objections and the matter was taken under advisement.

Plaintiff has three main objections to the magistrate's recommendations. First, he disagrees with several of the magistrate's factual findings as to the procedures currently employed by the North Carolina Department of Corrections. He also objects to the finding that there is no constitutional liberty interest implicated. Finally, he claims that he is entitled to due process protections in addition to those recommended by the magistrate.

Defendants have also made objections to the magistrate's memorandum and recommendation. They agree with plaintiff that the magistrate erred in some of his "factual findings." Defendants disagree with the magistrate's conclusion that prison regulations give rise to a state-created liberty interest in not being involuntarily transferred to a mental health facility. If there is a liberty interest involved, defendants claim that the procedures currently used by the Department of Corrections are adequate to satisfy due process. If additional procedural safeguards are required then the defendants ask for a modification of the magistrate's recommended procedures to allow more involvement by psychologists, rather than psychiatrists, to reduce duplication.

In its discussion of the facts the court has already addressed several of the objections to the magistrate's factual summary. Specifically, the court explained that it would continue to refer to the Wayne and McCain Mental Health Facilities as inpatient mental health facilities in order to distinguish them from facilities which are not exclusively for mentally ill inmates. *See* p. 1531 n. 1. Also, the court has altered its summary of the facts to reflect that all types of mental health personnel are involved in transfer decisions. *See* p. 1532 n. 2. Other challenges to the facts as summarized by the magistrate will not be addressed as they have little or no bearing on the outcome of this case. The parties have agreed that there are no genuine issues of material fact left to be decided. Therefore, disposition on summary judgment is appropriate. *See* Fed.R.Civ.P. 56. Accordingly, the court will proceed to a discussion of the legal questions at issue.

### III—LIBERTY INTERESTS

██ Before a court may order procedural due process protections it must first find that the plaintiff has a liberty or property interest that is protected by the due process clause of the Constitution. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). In dealing with the issue of confinement, transfer or physical treatment of a state prisoner, the court must focus on the question of liberty interest. *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). There are two sources of the liberty interest protected by the federal Constitution. First, a protectable liberty interest may independently arise from the due process clause when a prisoner is subjected to an aspect of confinement that is not within the conditions of incarceration ordinarily contemplated by a prison sentence. *Id.* at 493–94, 100 S.Ct. at 1263–

64. A state may also create a liberty interest protected by the due process clause when its laws or regulations grant particular rights to an individual and expressly predicate the deprivation or revocation of those rights on the occurrence of certain specified events or conditions. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

### A. *Constitutional Liberty Interest.*

Plaintiff argues that involuntary transfer or commitment of a North Carolina inmate to prison psychiatric facilities is outside of the conditions of confinement that would normally be expected to arise from a prison sentence. This, he argues, implicates a liberty interest arising independently under the due process clause.

The most compelling authority on this issue is found in the United States Supreme Court decision *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). In *Vitek* the court addressed the issue of whether the transfer of a Nebraska state inmate to a state mental hospital outside of the prison system implicated a liberty interest protected by the due process clause. The court found that the prisoner had both a constitutional and a state-created liberty interest in not being transferred from the prison system to a state mental hospital. *Id.* Changes in condition of confinement alone were not deemed sufficient to invoke due process protection "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him." *Id.* at 493, 100 S.Ct. at 1263. However, in very clear language the Court stated:

> None of our decisions holds that a conviction for a crime entitles the State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of a crime. . . .

> [I]nvoluntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual.

*Id.* Thus it was determined that an inmate has a constitutional liberty interest in not being transferred from a state prison to a state mental hospital. There were two important factors cited by the *Vitek* court which gave rise to such an interest: (1) the social stigma attached to commitment to a mental institution and (2) compelled treatment in the form of mandatory behavior modification programs. *Id.*

Defendants contend, and the magistrate agreed, that the instant case is distinguishable from the *Vitek* decision because the plaintiff in *Vitek* was transferred out of the Nebraska state prison system to a state mental hospital operated by the State Department of Public Institutions, while the transfers of which plaintiff Baugh complains occurred within the prison system itself. Defendants maintain that the involuntary transfer of a prisoner to an inpatient mental health facility within the North Carolina Department of Corrections does not constitute the fundamental and drastic change in a prisoner's status which would cause the kind of stigmatization discussed in *Vitek.* The magistrate also found that there was no indication that North Carolina inmates transferred to correctional psychiatric units were exposed to mandatory behavior modifications as was the plaintiff in *Vitek.*

█ An internal transfer within the North Carolina Department of Corrections system does not differ significantly from the transfer to a mental health facility run by another state agency. The magistrate put great emphasis on the distinction between being labeled as mentally ill in the eyes of the general public versus being labeled mentally ill by Department of Corrections personnel or by other inmates, claiming that it was only stigma as to the general population that was at issue in *Vitek.* However, stigma among other inmates and among prison personnel is at least as damaging to an inmate who has

been committed to an inpatient mental health prison facility.

Denial or delay of parole, study release, work release, and gain time jobs is often attached to a prisoner's assignment to a mental health unit. The magistrate found that it was the underlying abnormal behavior rather than an assignment to a mental health facility that was considered in making a parole or rehabilitative program decision. However, it is difficult, if not impossible, to believe that a parole board would not more closely scrutinize the behavior of an individual who had been committed to a prison mental health facility. This is precisely the type of stigma with which the Supreme Court was concerned in *Vitek*. In addition, it is clear that transfer to the inpatient facilities is detrimental to prisoners' ability to obtain gain time jobs. Although some gain time jobs are available to inmates treated in the Wayne and McCain facilities, there are not as many available as in normal prison units.

There is also undisputed evidence that a prisoner returning to the general prison population from a mental health unit are viewed as "bugs" by other inmates. These prisoners are ostracized and exploited by other prisoners. This type of labeling among the prison population is at least as damaging as being labeled a mental health patient by the general population.

Neither can the court agree with the magistrate that prisoners incarcerated in inpatient mental health facilities are not subjected to compelled treatment in the form of mandatory behavior modification programs. Psychiatric or psychological treatment is, by its very nature, an attempt to modify the behavior of individuals in order to conform their behavior to that which is expected by society. Although, as the magistrate states, it is counterproductive to "forceably administer" treatment, prisoners are "strongly encouraged" to participate in psychological treatment programs. An inmate might find himself sanctioned by staff who feel that he is belligerent in not accepting the treatment they feel is necessary.

Finally, the magistrate's reliance on *Parham v. J.R.* is misplaced. 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). *Parham* dealt with the due process rights of a minor whose parents voluntarily sought to have him committed to a mental institution. The *Parham* court conceded without discussion that a child has a substantial liberty interest in not being confined unnecessarily in a mental institution. *Id.* at 599, 99 S.Ct. at 2502. Analogizing the relationship of prison officials and inmates to the role of parents and children, as the magistrate did, may have some bearing on the procedures required, but does not lead to the conclusion that there is no constitutional liberty interest at stake.

In summary, the distinction made between mental hospitals run by a separate state agency and those run by the Department of Corrections is technical only. The purpose of the two types of institutions are the same, as are the consequences of being committed to one. Treatment in a prison mental health facility is not within the range of conditions normally expected during incarceration, just as treatment at a mental health facility outside the prison system is not within this range. *See Vitek*, 445 U.S. at 480, 100 S.Ct. at 1254. Plaintiff, and the class he represents, clearly have a protected constitutional liberty interest in not being transferred to an inpatient prison mental health facility.

### B. *State-Created Liberty Interest.*

Defendants contend that Magistrate Denson erred in finding that DOP regulations give rise to a state-created liberty interest in not being transferred to a prison mental health facility. Plaintiff contends that the magistrate's finding is correct.

■ A state creates a liberty interest when a state statute or regulation confers a particular status on an individual and expressly predicates the deprivation or revocation of that right or privilege on the occurrence of a specified event or condition. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d

668 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Where a transfer decision is solely within the discretion of prison officials and prisoners have no justifiable expectation that they will not be transferred absent a specified event or condition then no state-created liberty interest arises. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

■ According to prison regulations, an inmate must be suffering from an acutely severe psychiatric disorder that cannot be handled by prison outpatient mental health services before he may be transferred to an inpatient facility. DOP Health Care Procedures Manual §§ 401.1, 404.1 and 404.2; Deposition of Harrop, pp. 70–71. This requirement limits the discretion of psychiatric personnel and gives rise to a justifiable expectation by prisoners that they will not be transferred absent a finding that they are suffering from an acutely severe psychiatric disorder that cannot be treated in outpatient facilities. These are precisely the type of regulations found to give rise to a state-created liberty interest in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). *See also Hewitt v. Helms,* 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Greenholtz,* 442 U.S. at 1, 99 S.Ct. at 2100; and *Wolff,* 418 U.S. at 539, 94 S.Ct. at 2963. Plaintiff clearly has a state-created liberty interest in not being transferred to prison mental health institutions without a finding that he is suffering from psychiatric disorders which cannot be treated at outpatient facilities.

## IV—DUE PROCESS REQUIREMENTS

Plaintiff has both a constitutional and a state-created liberty interest in not being transferred to an inpatient mental health facility. He is therefore entitled to due process protection of that right. The DOP procedures provide certain safeguards for prisoners who are to be transferred. The court must now determine whether these procedures are adequate to protect plaintiff's due process rights or whether additional safeguards are necessary.

### A. *Factors to Consider.*

■ The purpose of due process safeguards is to ensure fundamental fairness in judicial or administrative proceedings which may adversely affect the protected rights of an individual. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To make this determination the court must balance three factors: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such an interest and the probable value of additional or different procedural safeguards; and (3) the state's interest and the fiscal or administrative burden that additional or different procedural safeguards would entail. *Id.*

### 1. Private Interests Affected.

The court cannot agree with the magistrate's characterization of plaintiff's interest as "strong." The plaintiff has a "powerful" interest in not being subjected to involuntary commitment to an inpatient prison mental health facility. *Vitek v. Jones,* 445 U.S. 480, 495, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980). Such a transfer exposes him to (1) the stigmatization of being labeled mentally ill; (2) subjection to behavior modification programs, possibly including drug therapy; and (3) the loss or delay of work release privileges. The private interest at stake here is identical to that at issue in *Vitek. Id.*

### 2. The Risk of Erroneous Deprivation of Inmate Interests Under the Present Procedures and the Value of Additional or Substitute Safeguards.

Under the current North Carolina procedures there is a significant risk that prisoners will be erroneously transferred to prison mental health facilities. The North Carolina procedures, although more extensive than the Nebraska procedures found to be inadequate in *Vitek,* suffer from many of the same deficiencies.

The Nebraska statutes at issue in *Vitek* provided for involuntary transfer of an inmate to a mental hospital within or without the prison system upon a finding by a prison physician or psychologist that the prisoner suffered from a mental disease or defect which could not be adequately treated in the prison facility to which he was assigned. Neb.Rev.Stat. §§ 83–176(2) and 83–180(1) (1976). No procedural safeguards were provided. The prisoner was simply transferred back to the prison system when the staff at the mental institution to which he was assigned determined that treatment was no longer necessary. Only when the state desired to retain the inmate in the mental hospital beyond the expiration of his prison sentence was it required to afford him full civil commitment proceedings. Neb.Rev.Stat. § 83–180(3) (1976).

The *Vitek* court held that additional procedural safeguards were necessary. 445 U.S. at 495, 100 S.Ct. at 1264. The procedures the court found to be appropriate were: (1) written notice to the prisoner that a transfer was being considered; (2) an informal, nonadversary hearing where the prisoner is given adequate notice, a disclosure of the evidence relied on by the prison authorities, and an opportunity to respond and present documentary evidence; (3) an opportunity to present and confront and cross-examine witnesses for prison officials except when good cause is found for not permitting such a hearing; (4) an independent fact finder and decision maker not necessarily from outside the prison system; (5) a written statement by the fact finder as to the evidence relied upon and the reasons for the transfer; (6) a qualified and independent adviser, provided at state expense if the prisoner is unable to afford one himself; and (7) effective and timely notice of the above rights. *Id.* at 494–98, 100 S.Ct. at 1264–66.

■ The North Carolina procedures do not afford prisoners transferred to DOC inpatient mental health institutions the extensive protections found to be necessary by the *Vitek* court. No notice is given to a prisoner that a transfer is being considered. Neither is the prisoner given any opportunity to present evidence or be heard on the matter. Nor is he given any assistance in preparing objections to a possible transfer. It is only after the decision to transfer is made that the prisoner is notified of the decision and given reasons for the referral. An inmate has the opportunity to object to the transfer only after it is already made; he can make objections to his "treatment team" or appeal his transfer through the grievance system.

■ Without the opportunity for pretransfer notice and an opportunity to be heard, a prisoner is afforded very little protection from erroneous transfer. Once the transfer is made, a prisoner has already been deprived of his due process rights, and subjected to stigmatization and compelled behavioral treatment. In addition, inmates who are mentally ill, or suspected of being so, are less likely than the average inmate to be able to present an organized defense to the charge that they are mentally ill. Thus, without help, there is a great risk that they will be erroneously transferred. Also, lack of an independent decision maker creates a great risk of erroneous deprivation. Common sense indicates that it is likely that an unruly or uncooperative inmate who is creating a problem for prison staff or the staff of an outpatient mental health facility may be erroneously classified as severely mentally ill and transferred to a mental health institution in an attempt to control his behavior, rather than for the purpose of treating any existing acute mental illness. Clearly, transfer for this reason would be inappropriate.

Additional procedural safeguards, such as those found to be necessary by the *Vitek* court, would be quite valuable in preventing erroneous transfer. Pretransfer notice and opportunity to be heard, the cornerstones of due process, would give prisoners an opportunity to defend themselves against charges which, under the current procedures, are never clearly presented to them. Help from an adviser in preparing a defense and the presence of

an impartial decision maker from outside the prison staff would assure that the prisoner's arguments against transfer were adequately presented and that the decision was made calmly, for the right reasons. Additional procedural safeguards such as these would be invaluable in protecting prisoners from erroneous transfer to mental institutions.

So, the risk that an inmate will be erroneously deprived of his right not to be transferred to a prison mental health institution absent a finding that he is mentally ill is extremely great under the North Carolina procedures as they currently exist. Additional procedural safeguards would be extremely helpful in preventing such erroneous deprivation.

3. The State's Interest and the Fiscal or Administrative Burden that Additional or Procedural Safeguards Would Entail.

■■■■ The state has a strong interest in segregating and treating mentally ill inmates. *Vitek*, 445 U.S. at 495, 100 S.Ct. at 1264. Additional procedural safeguards would, of course, make it more difficult for the state to accomplish this goal. If this court orders the state to provide prisoners with the trial-like procedures found necessary in *Vitek* then the valuable time of mental health professionals would be consumed by preparation for and testifying in such hearings. *Parham v. J.R.*, 442 U.S. 584, 606, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979). The state also has an interest in treating the mentally ill quickly and in not imposing unnecessary procedural safeguards which would discourage them from seeking treatment. *Id.* at 604–06, 99 S.Ct. at 2505–06. Also, there can be little doubt that more formal procedural requirements would impose a greater financial burden on the state, although the parties can only speculate as to the extent of this burden. It must be noted, however, that the state, like the inmate, has an interest in not wasting resources on inmates who are erroneously transferred. Additional procedural safeguards for inmates would increase the burden on state resources. However, this consideration must be weighed against the

other *Mathews* factors before the court can decide what procedures are constitutionally required.

### B. *Procedures Required.*

In his memorandum and recommendation the magistrate suggested additional procedural safeguards but, because he found the plaintiff's interest to be distinguishable from the private interest at stake in *Vitek*, he did not recommend the extensive procedures ordered by the *Vitek* court.

In contrast, the court finds the relevant factors here to be identical to those at issue in *Vitek:*

> ... [T]he interest of the State in segregating and treating mentally ill patients is strong. The interest of the prisoner in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful, however; ... the risk of error in making the determinations [to commit prisoners to mental institutions] is substantial enough to warrant appropriate procedural safeguards against error.

445 U.S. at 495, 100 S.Ct. at 1264.

■■■■ Consequently, procedural safeguards similar to those ordered by the *Vitek* court must be provided before a state inmate may be transferred to an inpatient mental health facility. In order to satisfy due process requirements, the state must provide:

1. written notice to the prisoner that referral to an inpatient mental health facility is being considered, including a statement of the reasons for the referral;

2. a hearing sufficiently after notice is given to permit the prisoner to prepare his objections;

3. an opportunity at the hearing for the prisoner to testify in person, present documentary evidence, present witnesses and confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permit-

ting such presentation, confrontation, or cross-examination;

4. a neutral and independent decision maker who may be from within the prison system but who has the authority to refuse admission;

5. a written statement by the decision maker as to reasons for his decision to transfer, which decision must be concurred in by two psychiatrists or psychologists;

6. qualified and independent assistance from an adviser, not necessarily an attorney, to help the prisoner prepare his objections;

7. periodic review of the continuing need for treatment; and

8. effective and timely notice of all of the above rights.

These procedures, while extensive enough to protect the rights of prisoners, are tailored to be as little a burden on the state as possible. All proceedings may take place within the institution from which the transfer is being considered. Likewise, all personnel may be associated with the institution, as long as the decision maker and the prisoner's advocate are independent and properly qualified. The procedures have also been modified, as requested by defendants, to allow two psychologists, rather than require two psychiatrists, to concur in the ultimate decision to commit.

 The court recognizes that emergency referrals will continue to be necessary on occasion. If an emergency situation arises, the state may, of course, treat the patient as required. Where it is not possible to provide pre-deprivation safeguards, the state must provide a post-deprivation procedure similar to that outlined above.

## V—SUMMARY

State inmates have both a constitutional and a state-created liberty interest in not being transferred to a prison facility exclusively for the mentally ill. Consequently these inmates are entitled to due process protection of this interest. In balancing the private interest affected, the risk of erroneous deprivation under the present North Carolina procedures and the value of additional safeguards, and the state's interests, the court finds that additional procedural safeguards are constitutionally required. Indeed, the interests at stake here are indistinguishable from the interests at issue in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 522 (1983). The *Vitek* decision, therefore, compels the court to conclude that the North Carolina Department of Corrections must provide the full panoply of procedural protections outlined above before it may transfer state inmates to any inpatient mental health facilities.

The 19 December 1983 memorandum and recommendation of Magistrate Alexander B. Denson is accepted in part and rejected in part, as explained above. An order will issue directing defendants to comply with the procedural requirements set out in this Opinion.

## ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby ORDERED that plaintiffs' motion for summary judgment be allowed and defendants' motion for summary judgment be denied. Defendants are ordered to provide the following procedural safeguards to state inmates before transferring them to an inpatient mental health facility:

1. written notice to the prisoner that referral to an inpatient mental health facility is being considered, including a statement of the reasons for the referral;

2. a hearing sufficiently after notice is given to permit the prisoner to prepare his objections;

3. an opportunity at the hearing for the prisoner to testify in person, present documentary evidence, present witnesses and confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

4. a neutral and independent decision maker who may be from within the prison system but who has the authority to refuse admission;

5. a written statement by the decision maker as to reasons for his decision to transfer, which decision must be concurred in by two psychiatrists or psychologists;

6. qualified and independent assistance from an adviser, not necessarily an attorney, to help the prisoner prepare his objections;

7. periodic review of the continuing need for treatment; and

8. effective and timely notice of all of the above rights.

Defendants are ordered to submit to the court within one hundred twenty (120) days from the date of this order proposed regulations implementing the procedures outlined above. The court specifically retains jurisdiction over the action.