**UNITED STATES of America, Petitioner–Appellee,**

v.

**Leroy BAKER, Respondent–Appellant.**

**No. 93–7139.**

United States Court of Appeals, Fourth Circuit.

Argued July 13, 1994.

Decided Jan. 25, 1995.

---

**ARGUED:** George Alan DuBois, Jr., Asst. Federal Public Defender, Raleigh, NC, for appellant. Barbara Dickerson Kocher, Sp. Asst. U.S. Atty., Raleigh, NC, for appellee. **ON BRIEF:** Janice McKenzie Cole, U.S. Atty., Raleigh, NC, for appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

Affirmed by published opinion. Judge RUSSELL wrote the majority opinion, in which Judge HALL joined. Judge WIDENER wrote a dissenting opinion.

## OPINION

DONALD RUSSELL, Circuit Judge:

The Judicial Conference of the United States has chosen the United States District Court for the Eastern District of North Carolina to partake in a pilot program involving the conduct of commitment hearings using video conferencing. In this test case, the respondent Leroy Baker appeals from the district court's entry of a judgment of commitment following a hearing at which he remained at his place of incarceration and was in contact with the government attorney and the district judge in Raleigh only by the use of video cameras, microphones and televisions. Baker claims the procedure followed violated his constitutional due process rights and his statutory rights under 18 U.S.C.

§ 4247(d). We reject these contentions and affirm.

### I.

In March of 1993, the Judicial Conference of the United States authorized the United States District Court for the Eastern District of North Carolina to conduct a pilot project using video conferencing. Under the project, it was anticipated that the mental competency hearings required under 18 U.S.C. §§ 4245 and 4246 would be conducted by means of video conferencing.

■ The statutory provision under which the government proceeded in the instant case, 18 U.S.C. § 4245, allows for the involuntary commitment of inmates to prison psychiatric facilities. In order to justify involuntary commitment under section 4245, the government must prove, by a preponderance of the evidence, that the respondent inmate is currently suffering from a mental disease or defect which requires "custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a). Commitment under section 4245 lasts until the government certifies that the inmate is no longer in need of treatment or until the inmate's sentence expires, whichever is earlier. *Id.* § 4245(d), (e).[1]

### II.

#### A.

On July 22, 1993, the government filed a motion, pursuant to 18 U.S.C. § 4245, in the United States District Court for the Eastern District of North Carolina to determine the

---

1. While no hearing in the case at bar was conducted under 18 U.S.C. § 4246, the parties have announced to this Court that they have agreed by stipulation that the Court's decision in this matter will govern hearings under both statutes. Section 4246 applies to individuals who are due for release from federal custody either because they have been found not competent to stand trial, because the charges against them have been dropped solely because of mental illness, or because they have completely served their sentences of imprisonment. If the government can prove at a section 4246 hearing, by clear and convincing evidence, that the respondent is suffering from a mental disease or defect as a result of which his release would pose a substantial risk of bodily injury to another person or serious

damage to the property of another, the respondent is to be involuntarily committed.

Because there was no commitment hearing in this case initiated pursuant to section 4246 on appeal, any holding we might make with respect to section 4246 would be an advisory opinion. While our holding herein with respect to hearings conducted under section 4245 may, because of similarities between that section and section 4246, bear on, or perhaps even control, analogous claims with respect to hearings under section 4246, the parties cannot, by virtue of their "stipulation," confer jurisdiction on this Court to issue an advisory opinion. *See 11126 Baltimore Boulevard v. Prince George's County*, 924 F.2d 557, 558 (4th Cir.), *cert. denied*, 502 U.S. 819, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991).

present mental condition of Leroy Baker, an inmate at the Federal Correctional Institution at Butner, North Carolina ("FCI–Butner").[2] The United States requested that the requisite hearing be conducted by video transmission. The district court granted this request by Order dated July 30, 1993. The court also appointed counsel to represent Baker. Baker, by counsel, filed a memorandum stating his objections to the use of video conferencing at the hearing.

Baker's commitment hearing was conducted, using video conferencing, on August 13, 1993. Following presentation of evidence, the district court found that the government had established, by a preponderance of the evidence, that Baker suffered from a mental disease or defect as a result of which he was in need of custody for care or treatment.

Immediately following the competency portion of the hearing, the district court afforded both sides the opportunity to be heard on the validity of video conferencing. Respondent there introduced documentary and testimonial expert evidence as to the potential dangers resulting from the use of the procedure in the context at hand. By Order dated October 19, 1993, the district court determined that the video conference violated neither Baker's constitutional rights nor his statutory rights. *United States v. Baker*, 836 F.Supp. 1237 (E.D.N.C.1993). Baker appeals.

### B.

The evidence presented by the government at Baker's commitment hearing tended to establish the following facts, which are not disputed on appeal. Baker, who was serving a 15–year sentence for bank robbery, was initially transferred to FCI–Butner for voluntary psychiatric treatment. While there, Baker, diagnosed as a paranoid schizophrenic, began refusing all medication. He required "continual seclusion due to inappropriate behaviors and florid psychosis." J.A. 10. The FCI–Butner mental health staff determined that Baker was in need of placement in a suitable facility where involuntary treatment proceedings could begin.

The district court found that the government had established, by a preponderance of the evidence, that Baker suffered from a mental disease or defect as a result of which he was in need of custody for care or treatment. Again, Baker's appeal does not challenge this determination.

### C.

Prior to the hearing, Baker was brought to a conference room within FCI–Butner where the video conference equipment had been installed. With Baker in the conference room were Baker's appointed attorney, Assistant Public Defender Alan DuBois; the government's witness; two security officers; Baker's unit counsellor; and various observers from the prison and the United States Attorney's Office. In the courtroom in Raleigh were District Judge Britt; Assistant United States Attorney ("AUSA") Linda K. Teal; the court reporter; the deputy clerk of court; Federal Public Defender Elizabeth Manton; and spectators.

The FCI–Butner conference room had been equipped with one 25–inch television monitor and two cameras. One camera was focused upon Baker and his attorney, the other upon the chair where witnesses testifying would sit; the camera focused upon Baker and his attorney could be made to zoom in on Baker. The Raleigh courtroom was equipped with two television monitors and two cameras. One monitor, with a 25–inch screen faced the judge; the other, featuring an 18–inch screen, faced AUSA Teal, Manton and the spectators. In order to see the monitor, Public Defender Manton had to sit at the prosecution table. With regard to the two cameras installed, one was focused upon the district judge and the other upon the AUSA.

The equipment installed allowed the monitors at each location to display only what one of the two cameras at the other location saw at any given time. One remote control device allowed one person to choose which camera's output would be displayed on the moni-

**2.** Although FCI–Butner is geographically within the Middle District of North Carolina, it is deemed by statute to lie within the Eastern District of North Carolina. *See* 28 U.S.C. § 113(a).

tor(s) at each location. At the FCI–Butner location, Baker's attorney controlled this device, while the district judge retained control over the counterpart device in the courtroom.

The government called only one witness: Dr. Rushton Backer. Dr. Backer testified from FCI–Butner. Direct examination was conducted by AUSA Teal from the courtroom in Raleigh. Complains Baker:

... In order to follow this examination in a normal manner, Mr. Baker and his attorney were required to continually shift their focus from Ms. Teal's image on the video monitor to Dr. Backer who was present with them at Butner. To note the judge's reaction to Dr. Backer's testimony, Mr. Baker's attorney had to switch the image on the monitor with the remote control. Mr. Baker's attorney then would switch back to Ms. Teal or return his attention to Dr. Backer. Thus, there was an almost constant shifting between live and video images.

When Mr. Baker's attorney switched to the judge, the witness could not see the person questioning him.... Similarly, if the judge focused on Mr. Baker, Ms. Teal could not see the witness she was examining until the judge switched back to the witness stand. Moreover, the court reporter could often not see the person speaking if the camera was focused elsewhere.

On cross-examination, the judge could not view Mr. Baker and his attorney and the witness simultaneously. The court was required to mechanically switch back and forth between the lawyer, respondent and witness with the remote control. The judge did not switch between these parties with every question but would often linger for some time on either the defense table or the witness stand.... In order for Mr. Baker's attorney to note the reaction of the judge to the cross-examination, he was required to shift his attention from the live witness to the video monitor which was set up at approximately a 90 degree angle from the witness stand.

Appellant's Br. 8–9 (citations omitted).

Following the completion of Dr. Backer's testimony, Baker made a brief statement from the defense table. Because of the camera's limitation, he had to remain seated in order to be visible. The court then heard arguments from AUSA Teal in Raleigh and from Baker's attorney at FCI–Butner.

With regard to the quality of the video transmission, Baker asserts:

The quality of the video transmission during the hearing was not great.... It was not comparable to television broadcast quality. Though each participant was recognizable, there was a fuzziness and jerkiness to the video image. The participants' movements did not appear completely smooth and natural. The sound quality was comparable to a long-distance phone call.

Appellant's Br. 10 (citation omitted). The district court, by contrast, found, as matters of fact:

1. "Ms. Tomawski, the court reporter, transcribed the full proceedings with no apparent difficulty." 836 F.Supp. at 1237.

2. "The court had no difficulty hearing and understanding the questions of Mr. DuBois or the testimony of Dr. Backer." *Id.*

3. "The court had no difficulty hearing Mr. Baker." *Id.*

4. "[T]he court had no difficulty hearing and understanding the [closing arguments] of the attorneys." *Id.*

5. "Throughout the hearing the video transmission was clear. The court was able to see the respondent, his attorney and the witnesses at Butner with clarity comparable to that of the parties in the Raleigh courtroom. Facial expressions were evident and demeanor was clearly observable." *Id.*

### III.

A commitment hearing is a civil matter. *Addington v. Texas,* 441 U.S. 418, 428, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979) ("[i]n a civil commitment state power is not exercised in a punitive sense"); *United States v. Copley,* 935 F.2d 669, 672 (4th Cir. 1991). Thus, the constitutional rights to

which a defendant in a criminal trial is entitled do not adhere to a respondent in a commitment hearing. Nonetheless, because an adverse result in a commitment hearing results in a substantial curtailing of the respondent's liberty (whether the respondent is already a prisoner or not), *Vitek v. Jones*, 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980), the Supreme Court has held that procedural due process does guarantee certain protections to civil commitment respondents, *see id.* In addition, Congress, by statute, has expressly provided for certain protections. *See* 18 U.S.C. § 4247(d). Baker claims that the use of video conferencing technology in conducting his hearing under section 4245 violated both his due process rights and his statutory rights.

### IV.

 Where the government seeks to deprive someone of a liberty interest protected by due process, due process demands that certain procedural safeguards be provided. *See Vitek*, 445 U.S. at 495–96, 100 S.Ct. at 1265. The Supreme Court has identified the following three factors to consider in determining those procedural safeguards due a person whose interests are to be adversely affected by government actions:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Because an adverse outcome in a commitment hearing results in a massive curtailment of a person's liberty, *Humphrey v.*

*Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), due process, whether under the Fifth or Fourteenth Amendments, affords respondents in such hearings several procedural protections, *Addington*, 441 U.S. at 425, 99 S.Ct. at 1809. This is true even where the respondent is already a prisoner in custody of the state or federal government. *Vitek*, 445 U.S. at 491–94, 100 S.Ct. at 1262–64.

In *Vitek*, the Court identified the following as minimum safeguards to which due process entitles a respondent in a commitment proceeding: a hearing at which evidence is presented and the respondent is provided a chance to be heard and to present documentary evidence as well as witnesses; the right to confront and to cross-examine government witnesses at the hearing, except upon a showing of good cause; an independent decisionmaker; a written, reasoned decision; the availability of an independent advisor, not necessarily an attorney [3]; and effective and timely notice of the pendency of the hearing and of all these rights. *See id.* at 494–96, 100 S.Ct. at 1264–66.

 *Vitek* makes clear that due process entitles the respondent at a commitment hearing to some right to confront and cross-examine the witnesses against him, and the right to an "independent" advisor. Baker claims that these due process requirements approximate, if they are not coextensive with, the corresponding rights to which a criminal defendant is entitled under the Sixth Amendment. Baker also claims that he is entitled to a right to be "present" at the hearing.

 Of course, the video conference procedure does not preclude the respondent from confronting and conducting relevant cross-examination of the witnesses. Moreover, the use of video conferencing allows for the respondent's "presence," at least in some sense, at the commitment hearing. The only question is the extent to which the video conferencing procedure preserves the es-

---

**3.** Four Justices expressed the view that due process entitles a civil commitment respondent to representation by an attorney. Justice Powell expressly disagreed, *see* 445 U.S. at 499–500, 100 S.Ct. at 1267–68 (Powell, J., concurring in part). The remaining four Justices did not reach the issue because they believed the controversy presented to be moot, *see id.* at 500–01, 100 S.Ct. at 1267–68 (Stewart, J., joined by Burger, C.J., and Rehnquist, J., dissenting); *id.* at 501–06, 100 S.Ct. at 1268–70 (Blackmun, J., dissenting).

sence of these rights sufficiently so as to conform with the strictures of due process. To answer this question, we must turn to the three-part analysis enunciated in *Mathews v. Eldridge.*

### A.

■ The first factor we must consider is the nature of the interest affected by the government action. As noted above, the involuntary commitment of an individual is a substantial curtailment of that individual's liberty. However, while substantial, the curtailment is not as great as the curtailment inherent in criminal imprisonment. The government's efforts to civilly commit a person are not punitive in nature. *See Heller v. Doe by Doe,* — U.S. —, —, 113 S.Ct. 2637, 2645, 125 L.Ed.2d 257 (1993) ("[C]onfinement in prison is punitive and hence more onerous than confinement in a mental hospital."). Additionally, civil commitment lasts only so long as the person committed continues to suffer from a mental disease or defect such that he or she is a danger to self or others.

Baker argues that these distinctions are purely theoretical. In practical terms, he argues, the effects of commitment are worse than the effects of imprisonment: while criminal prisoners are assured, in most cases, that their sentences are of definite maximum duration after the expiration of which they can be sure of release, inmates committed under section 4245 have no specified release date. Further, the committed respondent must bear not only the stigma of having been incarcerated at a federal prison, but also the stigma of having been formally adjudicated to suffer from a mental disease or defect.

We disagree. Were the fact that a commitment hearing is civil in nature merely a "theoretical" distinction, then that fact would not justify, as it does, the lower standard of proof in a commitment proceeding. *See Heller,* — U.S. at —, 113 S.Ct. at 2645 ("[B]ecause confinement in prison is punitive and hence more onerous than confinement in a mental hospital, ... the Due Process Clause subjects the former to proof beyond a reasonable doubt, ... whereas it requires in

the latter case only clear and convincing evidence." (citations omitted)). Thus, as the district court found, the deprivation arising from a successful civil commitment proceeding is not as great as the deprivation resulting from a successful criminal prosecution. Nonetheless, the deprivation is great, meaning that the government's interest in conducting the hearings by means of video conferencing technology must be great, and the risk of an erroneous deprivation of liberty small for the government to prevail.

### B.

■ *Mathews v. Eldridge* next directs us to consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." It is consideration of this factor which best identifies the distinctions between the situation of a criminal defendant from that of a commitment respondent.[4] The goal of a criminal proceeding is to uncover the truth by examining rigorously the reliability of conflicting evidence presented and then engaging in extensive factfinding. The rights of cross-examination and confrontation, as well as the right to effective assistance of counsel, are all directed toward this goal. *See Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."). In such an undertaking, the finder of fact is called upon to determine the veracity of the testifying witnesses based, *inter alia,* upon the witnesses' demeanor while testifying.

■ As compared to the goal of a criminal trial, the goal of a commitment hearing is far different: whether the respondent is mentally competent. *See Vitek,* 445 U.S. at 480, 100 S.Ct. at 1257 ("[T]he inquiry involved in determining whether or not to transfer an inmate to a mental hospital in-

---

4. We assume, without deciding, that the use of a video conferencing procedure at a criminal trial would violate one or more of the constitutional rights to which a criminal defendant is entitled.

volves a question that is essentially medical."). This determination is made by the court and is based primarily upon the opinions of experts proffered by the government and the respondent. The expert opinions will not differ factually but only in their theoretical premises. As a result, to whatever extent the opinions are delivered by way of oral testimony, the court will determine which experts' opinions it finds more persuasive based not upon the demeanor of the experts while testifying, but upon the qualifications of the experts, and the substance and thoroughness of the opinions offered. *Cf. Mathews v. Eldridge*, 424 U.S. at 344, 96 S.Ct. at 907.[5] The aim of cross-examination is changed accordingly: its goal is not to "poke holes" in the testimony of a witness, but to test the expert opinion given and determine its basis and its limits.

In light of this distinction, while, as *Vitek* makes clear, the due process rights play an important role at a competency hearing, rights as extensive as those afforded by the Sixth Amendment to criminal defendants are not required to insure against erroneous deprivations of liberty. In short, providing rights to civil commitment respondents less extensive than the counterpart Sixth Amendment rights to which criminal defendants are entitled runs far less risk of erroneous deprivation of liberty than would affording similarly limited rights to criminal defendants. *See Mathews*, 424 U.S. at 344–45, 96 S.Ct. at 907–08.

Baker raises two arguments in support of his position that the risk of erroneous deprivation from a hearing conducted by means of video conferencing is excessive. These arguments are discussed *seriatim.*

1.

Baker claims that the key factor in any commitment hearing is the impression the respondent makes on the presiding judge. Video conferencing, Baker claims, undermines the ability of the respondent to make a favorable impression upon the court, and, thereby, his ability to present an effective defense: he claims, first, that the respondent's ability to understand and appreciate the purpose and significance of the hearing is impaired, and, second, that the respondent's confidence in the hearing's impartiality and fairness is undermined.

We are not persuaded. We agree with the district court that, contrary to respondent's contention, the district judge's impression of the respondent is not generally the factor upon which a commitment decision turns. Rather, the judge is more likely to be swayed by documentary and testimonial evidence of the respondent's mental competency. This is true in a civil commitment hearing as opposed to a criminal trial because, as discussed above, a commitment hearing is not so concerned with factfinding as is a criminal trial. *See* discussion, *supra*, at 844–45 & n. 5.

With regard to whether a respondent will react adversely to the presence of a video camera, the district judge recognized that, in such cases, video conferencing would be inappropriate.[6] The district court below, however, found, as a matter of fact, that the

**5.** In *Mathews*, the Court held that due process does not require an evidentiary hearing before social security benefits can be discontinued. In its discussion of the risk of erroneous deprivation, the Court explained:

[T]he decision whether to discontinue disability benefits will turn, in most cases, upon "routine, standard, and unbiased medical reports by physician specialists," *Richardson v. Perales*, 402 U.S. [389, 404, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971)], concerning a subject whom they have personally examined. In *Richardson* the Court recognized the "reliability and probative worth of written medical reports," emphasizing that while there may be "professional disagreement with the medical conclusions" the "specter of questionable credibility and veracity is not present." [*Id.* at 405, 407, 91 S.Ct. at 1429, 1430]. To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions.

424 U.S. at 344, 96 S.Ct. at 907 (footnote omitted).

**6.** The district court suggested that some respondents may actually *prefer* a video conference hearing because such a hearing would allow them to remain at the already familiar surroundings of the facility where they feel more comfortable.

use of the video conferencing technology did not adversely affect Baker; on the record before us, we cannot say that this finding was clearly erroneous. The mere fact that some inmates may react adversely to the procedure does not make the use of the procedure unconstitutional in all cases.

▮ With regard to the notion that a respondent may lose confidence in a hearing conducted by video conference, the government properly notes that such a concern is, in general, largely irrelevant to the constitutionality of the proceeding. Quite often, as the government appropriately observes, criminal defendants lack confidence in a criminal proceeding conducted with the full panoply of constitutional protections. In other words, there is no constitutional right to a hearing in which the participants have confidence.

### 2.

▮ Baker next claims that the video conferencing system impedes counsel's ability to present an effective defense, thereby impinging the respondent's right to effective assistance of counsel. Specifically, Baker contends that the fact that the AUSA remains in the courtroom with the district judge while the respondent's attorney attends his or her client at FCI–Butner creates a disadvantage for defense counsel. Argues Baker:

> . . . While the AUSA is directly present arguing before the court, the client's attorney is reduced to a voice coming out of a box accompanied by a grainy television image. No trial lawyer would willingly agree to a system which would require him

to address the fact-finder electronically from some distant locale while allowing his adversary direct, unmediated, more emotionally acute access to the same decision maker.

> In addition to losing a personal, immediate connection with the court, the respondent's lawyer will be compromised in his ability to gauge the effectiveness of his argument and to intuitively sense the court's level of interest or areas of concern. This information can only be learned by being in the same room as the party you are addressing.

Appellant's Br. 27–28.

▮ We are not persuaded. The complaints Baker raises about defense counsel's ability to function go to counsel's ability to ascertain the facts on direct and cross-examination by gauging a witness and reaching, in an "emotionally acute" way, the fact-finder. As described above, factfinding, in this sense, is not an essential part of a civil commitment hearing. Thus, we do not believe that the fact that a commitment hearing has been conducted by video conference makes the assistance of an advisor which the commitment respondent received ineffective as a matter of law.[7] Nor can we characterize as clearly erroneous the district court's finding that, here, Baker's counsel provided effective representation. As the court below observed, while defense counsel may have a decided preference for arguing in the courtroom directly before the judge, that does not reflect on the constitutionality of video conferencing.[8]

7. We note that, in *Vitek,* only four of five Justices voting on the issue expressed the belief that due process entitles a commitment hearing respondent to representation by an attorney, *see supra* note 3. We also note that, in *Baugh v. Woodard,* 604 F.Supp. 1529, 1538–39 (E.D.N.C.1985), the district court concluded that respondent state prison inmates at state civil commitment hearings have no constitutional right to legal counsel; we affirmed in part and vacated in part the district court's judgment in *Baugh v. Woodard,* 808 F.2d 333 (4th Cir.1987), although, because only the State of North Carolina took an appeal in that case, the question of whether the plaintiffs were entitled to legal counsel was not squarely before this Court. We need not determine here whether due process in fact requires that respondents in civil commitment hearings be afforded

representation by an attorney for, here, in accordance with 18 U.S.C. § 4247(d), Baker was represented by an attorney. Moreover, while, whether commitment respondents are entitled to representation by an attorney or merely by some competent "advisor," such representation must be "effective," for the reasons stated in the text, we conclude that video conferencing does not preclude the provision of sufficiently effective assistance such that the requirements of due process are met.

8. Baker also argues that the public's right of access to judicial proceedings is severely limited by video conferencing. *See Richmond Newspapers, Inc. v. Commonwealth of Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (pub-

## C.

■ The last *Mathews* factor looks to the public's and government's interest in conducting commitment hearings by means of video conferencing. As *Mathews* makes clear, fiscal and administrative concerns are properly taken into account. Here, despite the potential for high initial investment costs, the government claims, and the district court found as a matter of fact, that video conference hearings will prove far less expensive than traditional hearings.[9] From an administrative standpoint, it is difficult to transport potentially mentally unstable persons to a courthouse. Many such persons require medication and supervision. Thus, any such transport is both hazardous to the respondents and a burden to prison and courthouse officials. Further, the safety concerns inherent in transporting a potential mentally unstable person to a courthouse, with respect to the respondent and other parties, are substantially alleviated by the use of the video conferencing procedure. Overall, the government interests in the use of the video conference technology at civil commitment hearings are both apparent and substantial.

## D.

Balancing the factors, despite the sizable infringement upon an individual involuntarily

committed, we conclude that, in light of the slight risk of erroneous committal and the substantial government interests enunciated above, the video conference procedure is neither unconstitutional in general nor unconstitutional as applied here.

## V.

■ We turn to the question of whether the video conferencing procedure violated Baker's statutory rights under 18 U.S.C. § 4247(d). Section 4245(c) directs that all commitment hearings thereunder "shall be conducted pursuant to the provisions of section 4247(d)." 18 U.S.C. § 4245(c). Section 4247(d), in turn, provides that, in a commitment hearing,

> the person whose mental condition is the subject of the hearing shall be represented by counsel.... The person shall be afforded an opportunity to testify on his own behalf and to confront and cross-examine witnesses who appear at the hearing.

18 U.S.C. § 4247(d). The statute, of course, cannot afford rights less protective than those guaranteed under the Fifth Amendment's Due Process Clause. Thus, the only question is whether section 4247(d) grants

---

lic has constitutional right of access to criminal trials). He complains that the public can see of the other location only what the person (presumably the judge) who controls the switch that alternates between cameras lets them see. Moreover, it is probable that many observers may find it difficult to see a single television monitor, especially from a distance. Respondent argues that this curtailment of the public's right of access tends to undermine the validity of a civil commitment hearing. *See Richmond Newspapers, Inc.,* 448 U.S. at 592, 100 S.Ct. at 2835–36 (Brennan, J., concurring) (public's right of access to the courts helps to minimize abuse of judicial power, thereby helping to ensure fairness in judicial proceedings).

This argument is without merit. Even assuming, *arguendo,* that the public's right of access extends to civil commitment hearings conducted pursuant to 18 U.S.C. § 4245, the public is not guaranteed a direct view of all that transpires. Spectators are generally seated in a specified part of the courtroom distant from the parties, their attorneys and the judge, and are often unable to see the face of each person when he or she speaks. *See United States v. Yonkers Bd. of Educ.,* 747 F.2d 111, 113 (2d Cir.1984).

9. Respondent claims that the government failed to produce evidence in support of this claim. The district court found otherwise, however, and its finding is not clearly erroneous. Respondent also claims that there exist other, less expensive, alternatives to video conferencing which would allow the district judge to be physically present with the respondent at the commitment hearing. While this may well be the case, due process does not require the government to adopt the least expensive means of conducting a hearing. *Cf. Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (requirement that speech regulation be narrowly tailored to survive intermediate scrutiny and pass muster under the First Amendment intermediate scrutiny does not require the government to adopt "the least restrictive or least intrusive means" of achieving its goals). Due process requires only that the means adopted by the government not, in light of the individual's liberty interest and the government interests at issue, create a substantial risk of erroneous deprivation of liberty. That standard, as demonstrated in the text above, is clearly met here.

rights more protective than those provided by the Due Process Clause.

Our research reveals only one case which addresses this question. In *United States v. Veltman,* 9 F.3d 718 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1572, 128 L.Ed.2d 216 (1994), the Eighth Circuit was asked to determine the standard according to which a civil commitment respondent's purported waiver of the right to counsel conferred under section 4247(d) is to be evaluated. Held the court:

> Given th[e] contrast between a section 4245 proceeding and [a] criminal trial, we are satisfied that the statutory right to counsel may be waived in a section 4245 proceeding under conditions less exacting than the Sixth Amendment requirement in a criminal trial. The text of section 4247(d), detailing the nature of the hearing to be conducted, provides little guidance regarding when a waiver should be permitted. However, *Congress decided not to offer the full procedural protections available in criminal trials. See* 18 U.S.C. § 4245(a), (c); § 4247(d) (no jury trial). Rather, Congress apparently sought to satisfy the Supreme Court's holding in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), requiring certain due process protections for prisoner transfers to mental hospitals.

9 F.3d at 721 (emphasis added).

The legislative history of section 4247(d), though scant, accords with this view. A Senate report states: "Under subsection (d) [of section 4247], the [commitment] hearing is required to meet certain due process requirements." S.Rep. No. 225, 98th Cong., 2d Sess. 249, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3431.

We conclude that, except as may explicitly be provided otherwise,[10] section 4247(d) affords respondents at commitment hearings no greater protection than does the Fifth Amendment's Due Process Clause. As a consequence, the discussion above forecloses Baker's argument based upon section 4247(d).

## VI.

Because the use of video conferencing at Baker's civil commitment hearing violated none of Baker's constitutional or statutory rights, we affirm the judgment of commitment below.

*AFFIRMED.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

## I.

As the district court pointed out at the hearing to determine the competency of Baker and his suitability for transfer for mental treatment, this is a test case set up by the Judicial Conference of the United States which makes me quite aware of the significance of the remarks I am about to make.

In my opinion, this case is singularly inappropriate as a test case to determine the validity of the use of television as a means of providing to such a prisoner as Baker the amount of process which he is due. A brief allusion to Baker's background will show what I mean.

## II.

On the date of the hearing, Baker was 36 years old. He had been admitted to the mental-health division at FCI Butner on May 14, 1993, having been originally convicted of bank robbery on January 6, 1986, and received a 15-year sentence. He had been provisionally incarcerated in the mental-health division at Butner but was released to a community health center in 1990. Apparently he had been released on parole, which was violated when he assaulted his mother,

---

10. As noted above, the Supreme Court has held only that due process entitles a respondent at a commitment hearing to representation by a competent advisor, but not an attorney. To the extent that commitment respondents are in fact not entitled to representation by an attorney, Congress, by enacting section 4247(d), has opted to confer such right in excess of what due process requires. Whether due process requires representation by an attorney or not, our discussion above disposes of any argument that the use of video conferencing technology renders the assistance of counsel ineffective both in general and in this case.

and he was returned to FCI Butner on February 6, 1992. After stabilization on psychiatric medications, he was sent to FCI Jessup, Georgia on October 2, 1992, but due to inappropriate behavior consisting of following the female staff, he was transferred back to FCI Butner where he consented to voluntary hospitalization. While at the mental-health division in Butner, his mental status deteriorated, and he refused medication. A deterioration of his behavior accompanied his refusal to take medication, and on July 22, 1993, the warden of FCI Butner moved for a hearing pursuant to 18 U.S.C. § 4245.

At the hearing there was testimony from Dr. Rushton A. Backer, a forensic psychologist who testified as to Baker's mental history, which was to the effect that he had been suffering mental difficulties since at least the mid-seventies for what then appeared to be a schizophrenic disorder. He had been hospitalized ten other times, apparently all due to mental disease, including three admissions to Butner. Dr. Backer concluded that Baker's principal diagnosis was that of schizophrenia-paranoia type, chronic, and, in addition to other difficulties, he was mildly mentally retarded.

Baker offered no expert testimony on his own behalf, but the court had appointed Dr. Billy W. Royal, a physician, to represent Baker's interest, who had filed a two-page report dated August 10, 1993.[1] Dr. Royal had interviewed Baker and reviewed the clinical files and other records available to him at Butner. He had also talked to the staff at Butner and had conferences with Baker. After reciting that the speech of Baker was at one time a mixture of words and phrases that didn't connect with each other, Dr. Royal concluded that his diagnostic impression was that Baker was suffering from chronic schizophrenia. That was a provisional finding.

There was no other evidence taken, expert or otherwise, but Baker requested permission to make a statement, which is here quoted in full:

Mr. Baker: "I'm doing time in the school year. I came from New York about '75. I started—I went to a psychiatrist, got a note. It was some kind of ordeal in Savannah with a car lot dealer. They suggested they wanted me some kind of unnatural because I was too compromising, never got in trouble and they wanted me down there in the trouble wing. So they goes way back. They assign to me to get me in trouble some kind of wing. So they got all so much financing, establishments they had, you know, and I found out the reason why. It was located from up north in Long Island. And when they got to get to the point over me, they kept in cross-examining me and chastising me and making points that I was always wrong, I couldn't do nothing and I thought why they treat me like this. And seems like every time investment was coming along, it's like they started going haywire around and going this place and go this place and lot of places and it sounded—they never would tell me nothing. I figure if they wanted to put me on medication so that they can seem more normal than me."

The statement of Baker, the testimony of Dr. Backer, and the letter from Dr. Royal were all the evidence in the case. Following that, Baker's attorney did not argue that Baker was not "suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment." Indeed, the gist of his argument was that Baker's treatment at Butner had not been closely enough monitored, and, in all events, he told the court:

Something happened between May 14 and June 18 that caused Mr. Baker's condition to deteriorate to such an extent that eventually the government felt duty bound to come into court and say he's so far gone now we have to involuntarily commit him. (A.31)

* * * * * *

He is in need of treatment and hopefully the treatment he is given will be successful as it has been in the past but it is, I think,

---

**1.** This report is not in the record, but there is no reason to believe that the district court's summary of the same is inaccurate.

a cause for concern when the involuntary nature of the commitment is a situation which is partially created by factors that are beyond the control of the patient. And I think that's what happened here so I just asked that the court take that into account in making its determination in this case. Thank you. (A.32–33)

So this was, in all respects, an uncontested hearing. The only issues in such hearings for the district court to decide are whether the prisoner is suffering from a mental disease or defect and whether he needs custody for the care or treatment of any such mental disease or defect. These are, of course, essentially factual findings. In this case, there is no doubt that the record supports the conclusion that Baker is suffering from a mental disease or defect and that he is in need of custody for care or treatment of the same.

### III.

But there was no contested fact here for the court to decide. Any risk of mistake in such a case as this is minimal, even if it exists at all, where the government's expert, the prisoner's expert, the government's attorney, and the prisoner's attorney all agree on the result. I suggest that such a case with an uncontested result is quite inappropriate as a test case to ascertain the validity of the use of television in a proceeding in which the credibility of witnesses and the weight of their testimony must be decided and on which the outcome of the case depends.

### IV.

There are only two real issues in this case, and they are: first, is a man to be deprived, possibly indefinitely, of his liberty because of the factual findings of a judge which are not made upon the personal appearance of the witness before the judge; and second, should the man be deprived as a matter of law, as here, of the opportunity to be present before the judge at the hearing and personally address the judge who is the fact finder?

Even if the answers to both of these questions are in the affirmative, a third issue must then be taken into account which is:

does administrative convenience (and the procedure at issue can claim no other justification) excuse or justify such harsh treatment?

### V.

The issues in this case are profound. They are directly concerned with human liberty, which, of course, other than life, is the most important value the law protects. I think we unnecessarily fall into error by accepting, deciding, and, by publication, putting our stamp of approval on a procedure of the most profound importance in a case which is essentially uncontested. We may only guess as to what the result here would have been had Dr. Backer testified that Baker was insane, had Dr. Royal testified that Baker was not insane, and had Baker made a rational statement in his own behalf rather than the statement appearing on pages 849–50 of this dissent, which, to me, indicates a detachment from reality which was at once apparent to everyone connected with this proceeding. It will take a contested case, I suggest, before we should ascertain whether a man should be deprived of his liberty by a merely televised witness and whether a man should be so deprived of the opportunity to be present and face and address the court.

The Virginia Court, in addressing the delegation of legislative power, has addressed the importance of not approving shortcuts on account of administrative convenience, and we should heed that admonition. In *Thompson v. Smith*, 155 Va. 367, 154 S.E. 579, 584 (1930), the Court stated:

[I]t is a fundamental principle of our system of government that the rights of man are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus. This principal ought not to be surrendered for convenience or in effect nullified for the sake of expediency.

The problem presented here is at least as old as the trial of Walter Raleigh, who begged the court in vain to bring Lord Cobham from the Tower. Sending the televised image of a witness from Butner to the City of Raleigh is

no different than sending Cobham's writings from the Tower to Winchester.[2]

## VI.

The questions here are far too important to be decided in an uncontested setting, and I think we are making a serious mistake in accepting this as a test case. It should have been decided in a brief unpublished per curiam opinion. In my opinion, this is an adulterated proceeding which has gone through the forms of law only, if that.

To repeat, I respectfully dissent.

**2.** Virginia has had more experience with hospitals for the mentally ill than any other State. In 1773, Virginia opened the first American hospital exclusively for the care of the mentally ill at Williamsburg, and in 1828 became the first State to open a second hospital located in the western part of the State at Staunton. Albert Deutsch, *The Mentally Ill in America* 66, 112 (2d ed.1949). In Virginia, questions of involuntary confinement for mental illness are heard in open court before a Special Justice face-to-face with the patient and witnesses. Va.Code Ann. §§ 37.1–67.1 to 37.1–67.4, 37.1–88, 37.1–90 (1990). Examination of the docket of hearings before Special Justice Charles L. Harrinton in Marion, Virginia for the month of August, 1993, corresponding to the month of Baker's television commitment, discloses a total of 82 hearings, all taking place on two afternoons a week between August 2 and August 30 in a conference room located at the State Hospital. As the hearings are held at the hospital, although they may be held in a court room, there is no need to transport patients outside of their controlled environment, and physicians and hospital staff and attendants are readily available to attend the patient as well as provide testimony. The only person inconvenienced at all is the Special Justice who must leave his office and travel to the hospital. If the Commonwealth, with her long history of experience with the care and treatment of the mentally ill, is able to treat these people so fairly, there is no reason the United States cannot do the same.